# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYRONE JUSTIN COWAN, | Case No. 1:16-cv-01826-DAD-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| DEBBIE ASUNCION, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On April 23, 2013, Petitioner was convicted after a jury trial in the Fresno County Superior Court of first-degree murder (count 1), attempted first-degree murder (count 3), and two counts of second-degree robbery (counts 2 and 4). (2 CT[1] 410–13). The trial court sentenced Petitioner to an indeterminate term of life without the possibility of parole (count 1) and a consecutive indeterminate term of life with the possibility of parole (count 3). Additionally, the trial court imposed two consecutive terms of twenty-five years to life on the enhancements as to counts 1 and 3. The sentences for counts 2 and 4 were stayed. (2 CT 423, 425). On July 13, 2015,

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on February 6, 2017. (ECF No. 10).

the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Cowan, No. F067354, 2015 WL 4199118, at *8 (Cal. Ct. App. July 13, 2015). The California Supreme Court denied Petitioner's petition for review on October 14, 2015. (LDs[2] 22, 23).

On December 5, 2016, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). In the petition, Petitioner raises the following claims for relief: (1) a deficient Miranda admonition, (2) ineffective assistance of counsel, and (3) cumulative trial errors. Respondent has filed an answer, and Petitioner has filed a traverse. (ECF Nos. 9, 12).

## II.

## STATEMENT OF FACTS[3]

The underlying incident occurred on August 1, 2007 in southwest Fresno near the intersection of Clara and Vine Avenues. Efigenia Meza had walked to a nearby school with her stepchildren that morning to register them for classes. A relative named Geremias Leon accompanied her on this errand. While crossing through a field on their way back home, the group was approached by a man carrying a rifle. The stranger began talking to them and gesturing towards Ms. Meza's and Ms. Leon's purses. Neither woman spoke English, but the children understood that he was saying, "Give me the bags." As the kids ran off to find help, the gunman shot and killed Ms. Meza. He also fired multiple rounds at Ms. Leon, who sustained a non-lethal bullet wound while attempting to reach safety. Both victims dropped their purses during the gunfire, and the killer took those items with him when he left the field.

Several law enforcement officers responded to reports of the shooting and secured the perimeter around Ms. Meza's body. The ensuing investigation led police to a nearby home where the suspect was believed to have fled. Following a stand-off that culminated in a SWAT team firing tear gas into the residence, Tyrone Cowan exited and surrendered to police. Cowan made several incriminating statements at the time of his arrest. He later participated in a recorded interview with homicide detectives, whereupon he further implicated himself in the shootings. We provide a more detailed summary of Cowan's statements in the Discussion, post.

. . .

There were extensive delays in the criminal proceedings due to questions concerning the defendant's mental competency. Cowan was transferred back and forth between the Fresno County Jail and Atascadero State Hospital (Atascadero) at least three times over a period of approximately four years. The staff members at Atascadero had suspected, and ultimately concluded, that he was feigning symptoms of mental illness in order to avoid prosecution. A final competency determination was made in August 2012, and the case was then tried to a jury in April 2013. An earlier plea of not guilty by reason of insanity was withdrawn by the defense prior to the commencement of trial.

---

[2] "LD" refers to the documents lodged by Respondent on February 6, 2017. (ECF No. 10).

[3] The Court relies on the California Court of Appeal's July 13, 2015 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

The prosecution's case-in-chief included testimony from Ms. Leon and from Ms. Meza's stepchildren, which established the facts surrounding the offenses. The jury was made aware that Ms. Leon and Ms. Meza's stepson had previously identified Cowan as the perpetrator during live show-up and photographic line-up procedures. Jurors also heard evidence regarding the defendant's incriminating statements to police.

Testimony by law enforcement officers and crime scene technicians revealed that one .22–caliber bullet and five spent .22–caliber shell casings were recovered from the crime scene. A search of Cowan's home uncovered bloody clothing, as well as another live round and spent shell casing which were of the same caliber as those found next to the homicide victim. The presumed murder weapon, an illegally modified .22–caliber Ruger rifle, was located at the bottom of a ponding basin near the field where the shooting took place. Forensic analysis indicated that all of the recovered shell casings had been fired from the .22–caliber rifle.

Pathologist Michael Chambliss, M.D., testified regarding the autopsy he performed on the deceased victim. His testimony explained that Ms. Meza was shot three times; once in the upper body and twice in the head. Dr. Chambliss believed that the injury to the back of the victim's head came last in the sequence of shots, preceded by bullet strikes to the left chest and right side of the face. The characteristics of Ms. Meza's final head wound indicated that the barrel of the gun was placed directly against her skull when it was fired.

The defense case was comprised of testimony from one expert witness. Dr. Avak Howsepian, a psychiatrist, evaluated Cowan on two occasions in October 2007 (approximately four months after his arrest). Based on those face-to-face meetings and a review of the defendant's medical records, Dr. Howsepian concluded that Cowan suffered from "bipolar disorder not otherwise specified; psychotic disorder not otherwise specified; mild mental retardation; and anxiety disorder not otherwise specified." He also noted that Cowan had a history of aggressive and "disinhibitive" personality changes which were attributed to a head injury he sustained as a child. Dr. Howsepian believed that Cowan's conditions sometimes caused his thought processes to become "highly distorted and highly disorganized," which could impair his ability to premeditate and deliberate, i.e., "to think things through clearly [and] consider consequences of what [he] might be doing."

In rebuttal, the prosecution called two court-appointed psychologists: Harold Seymour, Ph.D., and Richard Kendall, Ph.D. Dr. Seymour interviewed Cowan in 2010 and again in 2013, and diagnosed him with "a mood disorder not otherwise specified and with a borderline intellectual function." The expert did not find Cowan to be psychotic. He did, however, note that Cowan "was self-identifying with a lot of dramatic and atypical psychotic symptoms," which "is very unusual for somebody who's actually very mentally ill." This prompted Dr. Seymour to administer a standardized test designed to determine if someone is faking psychosis. Cowan's score on the examination was highly indicative of malingering.

Through the use of hypothetical questions, the prosecution elicited opinions from Dr. Seymour relevant to the defendant's mental state at the time of the shooting. The expert agreed that using a gun to facilitate a robbery and then shooting the victim when he or she failed to relinquish the demanded property would be classified as "goal-directed behavior." Subsequent flight from the crime scene, disposing of the stolen goods and murder weapon, changing out of bloody clothes,

and hiding from police would all likewise indicate planning and a goal-oriented thought process.

Dr. Kendall interviewed Cowan in February 2013, approximately six weeks before trial. Cowan reportedly told the expert, "All I remember is a whole lot of blood and demons, that's what I saw ... I found the gun and then I played with it ... I fired it and then I blacked out and I shot the gun again. I saw demons. I saw this lady laying on the ground. Then I left.... I did pick up the purses, but I put them on the street and I think someone else took [them]."

Cowan also disclosed details about what he had done after the shooting: "I ran back to my house, I took off my shirt and clothes because they had blood on them, then I went to my friend's house."[4] It was Dr. Kendall's opinion that Cowan had been feigning symptoms of mental illness during their interview. As for the defendant's behavior on the day of the shooting, the expert believed his actions demonstrated an intentional and "goal-directed" course of conduct.

Cowan, 2015 WL 4199118, at *1–3 (footnote in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[4] Cowan was apprehended at the home of an unidentified third party, which was not his place of residence. The bloody clothes, live ammunition, and the .22–caliber shell casing were found at a different location.

determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character

or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to

1  think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing

2  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

3      Where the state court reaches a decision on the merits but provides no reasoning to

4  support its conclusion, a federal habeas court independently reviews the record to determine

5  whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

6  Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

7  review of the constitutional issue, but rather, the only method by which we can determine

8  whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While

9  the federal court cannot analyze just what the state court did when it issued a summary denial,

10  the federal court must review the state court record to determine whether there was any

11  "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must

12  determine what arguments or theories ... could have supported, the state court's decision; and

13  then it must ask whether it is possible fairminded jurists could disagree that those arguments or

14  theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

15                                              **IV.**

16                                      **REVIEW OF CLAIMS**

17      **A. Miranda Violation**

18      In his first claim for relief, Petitioner asserts that his police interview was inadmissible

19  because he was never advised that if he were indigent, counsel could be appointed to represent

20  him. (ECF No. 1 at 6, 22).[5] Respondent argues that because Petitioner did not object at trial, this

21  claim is procedurally defaulted. Respondent further argues that even if the claim is not defaulted,

22  it should be denied because admitting the interview did not have a substantial and injurious

23  effect on the verdict. (ECF No. 9 at 16).

24      Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth

25  Appellate District, which denied the claim in a reasoned decision. The California Supreme Court

26  summarily denied Petitioner's petition for review. As federal courts review the last reasoned

27  state court opinion, the Court will "look through" the California Supreme Court's summary

28  _____
   [5] Page numbers refer to ECF page numbers stamped at the top of the page.

denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst, 501 U.S. at 806.

In denying Petitioner's Miranda claim, the California Court of Appeal stated:

***Miranda* Issues**

*Background*

When Cowan surrendered to police, he told a member of the SWAT team, "I know I killed her." He repeated this statement several times. A short while later, as he was receiving medical attention, Cowan turned to a paramedic and said that he was "sorry for shooting that lady." The comment was overheard by a homicide detective named Ray Villalvazo. In the ostensible interest of public safety, Detective Villalvazo asked Cowan where the gun was located. Cowan replied that he had dropped it in the street.

After being transported to police headquarters, Cowan attempted to engage Officer Manuel Maldonado in conversation by saying, "Hey bro, can I ask you a question?" The officer replied, "Sure. You can ask me anything you want." Cowan then made the following statements: "If I was in a field with a rifle and accidentally shot myself in the head, got scared, and pointed the gun away, not realizing my finger was still on the trigger and the gun was still firing, [and] next thing I know I shot two people, what can they do to me for that? What happens? You know, I didn't mean for all that to happen." Officer Maldonado gave a non-committal response, advising that he should "hold those questions and statements" for the homicide detectives who would be ready to speak with him in just a few minutes. He then escorted Cowan to an interview room and turned him over to Detective Villalvazo.

Once inside the interview room, Detective Villalvazo attempted to inform Cowan of his *Miranda* rights. The advisement was memorialized in an audio recording as follows: "[W]e have to, uh, you know, read you your rights before we get started, okay? [Cowan responds affirmatively.] All right. So before we do that I'll tell you that you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to an attorney and have an attorney present with you while you are being interrogated. Um, you understand each of these rights I have explained to you? [Cowan: "Yes. I do."]."

During the interrogation, Cowan described walking through a field near his house, discovering a firearm laying on the ground, picking it up, and firing the weapon haphazardly until it ran out of bullets. He accepted responsibility for injuring the two victims, but insisted that he had shot them by accident. Cowan denied attempting to rob the victims and also denied ever having possession of their belongings. When the detectives accused him of lying, he tried to negotiate with them, propositioning to reveal "everything that happened" in exchange for a "deal." Detective Villalvazo responded, "I don't cut deals." Cowan later expressed concern over the potential consequences of his actions and twice asked, "How many years I'm looking at?" He ultimately admitted to taking the victims' purses, but maintained that the shooting was accidental.

On the second day of trial, Cowan's defense attorney filed a motion in limine requesting a hearing pursuant to Evidence Code section 402 "on the issue of

statements attributed to [the defendant] during the time frame of arrest, processing and interrogation by police." The motion contained a general summary of the holdings in *Miranda* and of other related legal principles, but provided no discussion about the facts of the case or any explanation of how the defendant's *Miranda* rights might have been violated. When the motion was heard, the few arguments made by defense counsel were all directed towards Cowan's pre-interrogation statements, namely the statements of admission at the time of his arrest; his response to Detective Villalvazo's inquiry about the location of the gun; and the hypothetical question posed to Officer Maldonado at the police station.

The trial court ruled that all of Cowan's pre-interrogation statements were spontaneous and/or voluntary, unprompted by any attempt by police officers to elicit a response, and thus not violative of *Miranda.* The question and answer regarding the location of the gun was deemed admissible under the "public safety" exception to the *Miranda* requirements (*New York v. Quarles* (1984) 467 U.S. 649, 655). Commenting briefly on the warnings that were given before the formal interview, the trial court said, "As far as the *Miranda* advisement itself, it's clear, it's complete, and the defendant specifically states that he understands." Defense counsel did not object to, or otherwise disagree with, the court's conclusion on this point.

Appellant now asserts that Detective Villalvazo's *Miranda* advisement was defective because it failed to explain that he was entitled to legal representation regardless of whether or not he could afford private counsel. Respondent contends that the issue is forfeited since it was never raised in the trial court. In a Supplemental Opening Brief, Cowan alleges ineffective assistance of counsel based on his trial attorney's failure to preserve the issue for appeal.

*Forfeiture*

"To give force to the Constitution's protection against compelled self-incrimination, the [United States Supreme] Court established in *Miranda* 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.' [Citation.] Intent on 'giv[ing] concrete constitutional guidelines for law enforcement agencies and courts to follow,' *Miranda* prescribed the following four now-familiar warnings: '[A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " (*Florida v. Powell* (2010) 559 U.S. 50, 59–60, citing *Miranda, supra,* 384 U.S. at pp. 441–442, 479.)

Advisement of the absolute right to counsel regardless of indigence is no less important than the other three *Miranda* admonitions. (See *People v. Diaz* (1983) 140 Cal.App.3d 813, 822–824.) If law enforcement officials fail to provide any one of the four warnings prior to a defendant's custodial interrogation, subsequent admissions may not be used against the defendant in the prosecution's case-in-chief. (*Ibid*; *People v. Bradford* (2008) 169 Cal.App.4th 843, 852–854.) Because Detective Villalvazo did not advise Cowan of his right to obtain legal representation at no cost, the prosecution's reliance upon the statements he made during the interrogation was improper and should not have been allowed. However, "Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear

the specific ground of the objection.' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.)

> Evidence Code section 353 operates as a rule of forfeiture in the context of *Miranda* violations. (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 (*Polk* ).) "Accordingly, unless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal, even if the defendant asserted other arguments under the same decision." (*Ibid.*; accord, *People v. Rundle* (2008) 43 Cal.4th 76, 115–116, disapproved of on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 ["defendant's entirely generic motion to exclude all of his statements to law enforcement officers, coupled with the absence of specific argument that defendant had invoked his right to silence at the end of the first interview, failed to preserve this claim for appeal"].) Here, trial counsel's generic motion and boilerplate recital of various legal principles was insufficient to preserve Cowan's *Miranda* claim. As clear as Detective Villalvazo's omission appears in the record, so does the defense attorney's failure to bring the error to the attention of the trial judge. "Because [he] did not raise the issue of the substantive adequacy of the *Miranda* warnings in the trial court, defendant has forfeited that issue on appeal." (*Polk, supra,* 190 Cal.App.4th at p. 1194.) The statutory nature of the forfeiture precludes discretionary review of the claim. (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6.)

Cowan, 2015 WL 4199118, at *3–5.

1. Procedural Default

A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32. However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989). In determining whether a state procedural ruling bars federal review, the Court looks to the "last reasoned opinion on the claim." Ylst, 501 U.S. at 804.

Here, the California Court of Appeal found that Petitioner forfeited his Miranda claim by failing to assert a specific ground for suppression of his statements at trial. Cowan, 2015 WL 4199118, at *5. As the California Court of Appeal clearly and expressly stated that its decision on the Miranda claim rests on a state procedural bar, procedural default is appropriate if the state

procedural bar is independent and adequate. A petitioner, however, "may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." Martinez v. Ryan, 566 U.S. 1, 10 (2012) (citing Coleman, 501 U.S. at 750). Attorney error constituting ineffective assistance of counsel provides "cause" to excuse procedural default. Coleman, 501 U.S. at 754. A claim of ineffective assistance generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." Murray v. Carrier, 477 U.S. 478, 489 (1986). Here, Petitioner presented an independent ineffective assistance claim regarding counsel's failure to argue that the Miranda admonition Petitioner received was deficient.

The Court does not give AEDPA deference to the state court's determination on the ineffective assistance of counsel claim when deciding whether it constitutes cause for procedural default. Visciotti v. Martel, 839 F.3d 845, 865 (9th Cir. 2016). Therefore, the Court applies different standards when reviewing ineffective assistance of counsel "as a substantive basis of relief and as cause to avoid default of other claims." Id. (internal quotation mark omitted) (quoting Fischetti v. Johnson, 384 F.3d 140, 154 (3d Cir. 2004)). Ordinarily procedural bar issues are resolved first, but courts have recognized that "[p]rocedural bar issues are not infrequently more complex than the merits issues . . . so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)). Accordingly, the Court will proceed to review the claim de novo. See Cone v. Bell, 556 U.S. 449, 472 (2009) (if the state court did not reach the merits of the claim, the claim is reviewed de novo).

2. Merits Analysis

Before a suspect can be subjected to custodial interrogation, he must be warned "[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479. "The four warnings Miranda requires are invariable, but [the Supreme Court] has

not dictated the words in which the essential information must be conveyed." <u>Florida v. Powell</u>, 559 U.S. 50, 60 (2010). No "talismanic incantation" or "verbatim recital" is required to satisfy <u>Miranda</u>. <u>California v. Prysock</u>, 453 U.S. 355, 359, 360 (1981). "[R]eviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by <u>Miranda</u>.'" <u>Powell</u>, 559 U.S. at 60 (alterations in original) (quoting <u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989)).

Here, it is clear that a <u>Miranda</u> error occurred because officers did not advise Petitioner that an attorney will be appointed for him if he cannot afford one. (2 CT 381). However, a "<u>Miranda</u> error does not entitle [Petitioner] to habeas relief if the error was harmless." <u>Jones v. Harrington</u>, 829 F.3d 1128, 1141 (9th Cir. 2016). Habeas relief is available only if the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637. That is, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" <u>Id.</u>

Petitioner contends that the error was prejudicial because the prosecutor relied heavily on Petitioner's interrogation statements to support the argument that Petitioner acted with the requisite intent to be found guilty of murder, attempted murder, and robbery. (ECF No. 1 at 26). Petitioner also argues that the error was prejudicial because it impeached the defense expert's testimony, which formed the backbone of the defense, that Petitioner was unable to form the requisite intent. (ECF No. 1 at 28).

Petitioner's interrogation statements were cumulative of other statements that were admitted at trial. <u>See</u> <u>Mejorado v. Hedgpeth</u>, 629 F. App'x 785, 787 (9th Cir. 2015) ("Neither the exclusion nor the admission of cumulative evidence is likely to cause substantial prejudice."). For example, as Detective Andre Benson was placing handcuffs on him, Petitioner stated, "I know I killed her," without any prompting. (6 RT 1561). As Benson was searching Petitioner for weapons, Petitioner, without any prompting, "stated he did not mean to kill her. He also at one point indicated that he had tried to kill himself and that she had gotten in the way, but throughout the process he just continuously stated, 'I know I killed her. I know I killed her.'" (6 RT 1562).

As Officer Manuel Maldonada was walking Petitioner over to an ambulance, Petitioner stated, "I accidentally shot myself in the head, it was all an accident." (6 RT 1580). Petitioner told the paramedics that he was sorry for shooting that lady, that he did not mean for this to happen, and that he accidentally shot himself. (6 RT 1595–96). As Officer Maldonada was processing Petitioner at Fresno Police Headquarters, Petitioner asked Maldonada if Petitioner could ask him a question. Maldonada answered that Petitioner could ask him anything. (6 RT 1581). Petitioner then asked, "If I was in a field with a rifle and accidentally shot myself in the head, got scared and pointed the gun away, not realizing my finger was still on the trigger and the gun was still firing, next thing I know I shot two people, what can they do to me for that?" (6 RT 1581–82). Petitioner told Dr. Seymour, "They say I robbed—they say I hurt someone, killed someone and robbed them, but I didn't rob." (8 RT 2208). These admissible statements were consistent with and cumulative of Petitioner's interrogation, wherein he stated that the shooting was an accident, he denied taking the victims' purses, and expressed concern over the potential criminal consequences of his actions.

Petitioner also argues that the prosecutor used the recording of the interrogation to impeach the testimony of defense expert Dr. Howsepian. (ECF No. 1 at 28). When asked how Petitioner's diagnoses affect the way Petitioner thinks, Dr. Howsepian responded:

> Well, he tends to think—when he's in the grip of these symptoms I'm describing—in ways that are highly distorted and highly disorganized, not well thought through in ways that he will say things or think things that intrude upon his mind as opposed to him in a very deliberate way bringing them to mind. So there are a number of ways in which they affect him. He also, because of his mental retardation, is quite concrete in how he thinks. He doesn't seem to be able to think very abstractly or in the—the degree of detail that one might expect of someone his age, thinking about consequences or variables that infringe upon his situation in ways and acting without thinking very clearly."

(8 RT 2140). Defense counsel then asked, "these symptoms, and this diagnosis, how does it affect a person's ability to premeditate, deliberate, or harbor malice aforethought?" (8 RT 2141). Dr. Howsepian responded:

> Yes. So because these conditions impair an individual's ability to think things through clearly, to consider the consequences of what they might be doing or to consider certain aspects of their social

context in a way to act appropriately, because they think and act impulsively, their deliberation is often very clearly degraded substantially, and in his case, this is best seen, I think, in his diagnoses of personality change, the aggressive component of that and his bipolar disturbance, the main component, where there is a flood of thoughts going through his mind and a—and an exuberant kind of activity that doesn't—isn't very sensitive to what's in his environment. It's kinda driven by these internal pressures to think certain things, to talk nonstop, and to act in certain ways. So deliberation is substantially degraded in that respect. . . .

Yes. Premeditation also would fall into what I just mentioned as well, that an individual's ability to plan something and carry out their plan in some kind of a coherent, structured sort of way is interfered with by this flood of experiences and activity and thoughts that aren't under an individual's direct control. They control him rather than him controlling them. And the same holds for malice aforethought, which is a fancy designation that would also fall under this category of—not his—again, a certain context, certain circumstances, his not being able to form those kinds of, um, intentions toward another person, maybe being distracted by thinking of other things and acting in ways that are not quite consistent with what he's thinking in virtue of having so many things on his mind and having so much energy to expend.

(8 RT 1231–42).

Although the prosecutor may have used the recording of the interrogation to challenge the testimony of defense expert Dr. Howsepian, there also was other evidence introduced at trial that rebutted Dr. Howsepian's testimony that Petitioner was incapable of having the requisite state of mind. First, there was testimony that Petitioner's actions during and after the crime demonstrated goal-oriented behavior, contradicting Dr. Howsepian's testimony that Petitioner was incapable of premeditation, deliberation, or malice aforethought. Ms. Meza's stepson testified at trial that Petitioner was pointing a firearm at Ms. Meza and Ms. Leon, pulling at them, and saying, "Give me the bags, or—or else…" (5 RT 1284–86, 1302). Ms. Leon testified that Petitioner pointed a firearm at her and Ms. Meza and appeared to be demanding their purses. Ms. Leon, who speaks Spanish, could not understand what Petitioner was saying. (5 RT 1350–53). Ms. Leon testified that Petitioner shot Ms. Meza, who fell to the ground, and then Petitioner shot Ms. Leon, who then turned and started running away. (5 RT 1353–54). Petitioner followed Ms. Leon and continued shooting at her as she ran. (5 RT 1354). Ms. Leon testified that Petitioner had taken Ms. Meza's purse after he shot Ms. Meza, and Petitioner had picked up Ms.

Leon's purse that she dropped while running away. (5 RT 1354–55). After the incident, Petitioner changed out of his bloody clothes,[6] disposed of the firearm[7] and the victims' purses,[8] and hid from the authorities.[9] The prosecution's two expert witnesses testified that a hypothetical person who obtained a firearm, found a victim, used that firearm to instill fear in the victim, demanded property from that victim, and shot the victim if she failed to comply, exhibited goal-directed behavior. (8 RT 2217–18, 2248). The experts also testified that if this hypothetical person changed out of bloody clothes, disposed of the firearm and the property taken from the victim, and hid at another location, it would constitute goal-directed behavior. (8 RT 2218, 2248).

Second, contrary to Dr. Howsepian's opinion that Petitioner's diagnosis rendered Petitioner incapable of having the requisite state of mind, the prosecution's two expert witnesses testified that they believed Petitioner was malingering. Dr. Seymour administered a screening test based on his suspicion that Petitioner was attempting to manipulate his symptoms.[10] (8 RT 2212–13). Petitioner scored well above the cutoff for malingering, and Dr. Seymour's opinion of the test result was that Petitioner's "presentation is so excessive that in my experience if somebody were really having that level of psychosis going on they couldn't even carry on a conversation." (8 RT 2215). Although Dr. Kendall did not administer a formal test, he testified that in his opinion Petitioner "appeared to be feigning some symptoms of mental illness." (8 RT 2246). Dr. Kendall explained:

> When he talked about every facet of the crime that didn't involve culpability he was fine, but the moment he began talking about

---

[6] Petitioner told Dr. Kendall that after the shooting, "I ran back to my house, I took off my shirt and clothes, because they had blood on them, then I went to my friends [*sic*] house." (8 RT 2239). Bloody clothes, live ammunition, and a spent .22-caliber shell casing were found at Petitioner's residence. (6 RT 1638–39).

[7] When Detective Villalvazo asked Petitioner where the firearm was, Petitioner told him that he dropped it on the street on Tupman. (6 RT 1611). The firearm eventually was located in a ponding basin just east of the homicide scene. (7 RT 1817–19).

[8] Petitioner told Dr. Kendall, "I did pick up the purses, but I put them on the street and I think someone else took it." (8 RT 2239). However, Petitioner told Dr. Seymour, "They say I robbed—they say I hurt someone killed someone and robbed them, but I didn't rob." (8 RT 2208).

[9] Petitioner was apprehended at the house of a third party. Police spent approximately 2.5 hours, and eventually had to use CS gas, to get Petitioner out of the house. (6 RT 1566–68; 7 RT 1807).

[10] Dr. Howsepian testified, "I don't have a [*sic*] sufficient information to say that [Petitioner] was malingering with respect to any of his symptoms." (8 RT 2145). Dr. Howsepian explained that he believed Petitioner's screening test for malingering was not validly given because there was no documentation that Petitioner was able to understand what he was being asked. (8 RT 2145–46). On cross-examination, Dr. Seymour testified that the questions on the screening test had "been studied and shown to be effective with people who have mental retardation." (8 RT 2228).

culpability, that is discharging that weapon, all of a sudden he began to experience psychiatric symptoms. That is characteristically a sign that someone is malingering when they tell you everything not involving the act that I commit I was fine, but the moment I committed the act I now had psychiatric symptoms. That, again, is sort of a red flag this person could be malingering.

(8 RT 2246–47).

In sum, the weight of the evidence in support of the jury's guilty verdicts was considerable. Many of Petitioner's interrogation statements were cumulative of his other statements that were admitted. Apart from the recording of the interrogation, Dr. Howsepian's testimony and the defense's theory that Petitioner lacked the requisite mental state were contradicted by Petitioner's actions and the testimony of the prosecution's two expert witnesses. Based on the foregoing, the Court finds that the Miranda error did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

**B. Ineffective Assistance of Counsel**

1. Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

### 2. Failing to Challenge Deficient *Miranda* Admonition

In his second claim for relief, Petitioner asserts that trial counsel was ineffective by failing to argue that the Miranda admonition Petitioner received was deficient. (ECF No. 1 at 8). Respondent argues that the state court reasonably concluded that counsel's performance did not prejudice Petitioner. (ECF No. 9 at 23). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

*Ineffective Assistance of Counsel*
To establish a claim of ineffective assistance of counsel, an appellant "bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) Respondent does not address the first element of Cowan's claim, and focuses instead on the question of prejudice. It is appropriate that we do the same. (See *Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland* ) ["If it is

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."]; accord, *People v. Boyette* (2002) 29 Cal.4th 381, 430–431.)

The test for prejudice is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.) "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.... [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (*Id.* at pp. 695–696.)

Cowan generally concedes that the evidence of his identity as the shooter was overwhelming and uncontroverted. He argues, in essence, that the custodial interview portrayed him as lucid and calculating, and in such a way that undermined Dr. Howsepian's testimony regarding how his psychological disorders might have affected his ability to form the required mens rea of the charged offenses. In support of this position, Cowan points out that the prosecutor questioned all three experts about his behavior during the interview and further relied on the improperly admitted evidence during closing argument. The question, therefore, is whether it is reasonably probable that the jury would have made different findings on the elements of premeditation, deliberation, and/or the specific intent to steal or kill, but for its knowledge of what occurred during the interrogation.

Despite the facial cogency of appellant's argument, there is an important distinction between the *possibility* of a more favorable outcome and the likelihood that such a result would have occurred. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 218, quoting *Strickland, supra,* 466 U.S. at p. 694.) Stated another way, "[t]he likelihood of a different result must be substantial, not just conceivable." (*Harrington v. Richter* (2011) 562 U.S. 86, 112.) For the reasons that follow, we conclude appellant's burden has not been met.

With or without the interrogation evidence, Cowan's chances at a more favorable outcome were primarily dependent upon Dr. Howsepian's responses to two questions, neither of which were directed towards the specific facts of the case. The expert was first asked, "These diagnoses that you describe, how do they affect the way Mr. Cowan thinks?" Dr. Howsepian replied:

> "Well, he tends to think—when he's in the grip of these symptoms I'm describing—in ways that are highly distorted and highly disorganized, not well thought through in ways that he will say things or think things that intrude upon his mind as opposed to him in a very deliberate way bringing them to mind. So there are a number of ways in which they affect him. He also, because of his mental retardation, is quite concrete in how he thinks. He doesn't seem to be able to think very abstractly or in the—the degree of detail that one might expect of someone his age, thinking about consequences or variables that infringe upon his situation in ways and acting without thinking very clearly."

In follow-up to this response, defense counsel said, "I'm gonna ask you carefully this question: This—these symptoms, and this diagnosis, how does it affect a

person's ability to premeditate, deliberate, or harbor malice aforethought? Can you answer that?" The response was as follows:

> "Yes. So because these conditions impair an individual's ability to think things through clearly, to consider the consequences of what they might be doing or to consider certain aspects of their social context in a way to act appropriately, because they think and act impulsively, their deliberation is often very clearly degraded substantially, and in his case, this is best seen, I think, in his diagnoses of personality change, the aggressive component of that and his bipolar disturbance, the main component, where there is a flood of thoughts going through his mind and a—and an exuberant kind of activity that doesn't—isn't very sensitive to what's in his environment. It's kinda driven by these internal pressures to think certain things, to talk nonstop, and to act in certain ways. So deliberation is substantially degraded in that respect....
>
> Premeditation also would fall into what I just mentioned as well, that an individual's ability to plan something and carry out their plan in some kind of a coherent, structured sort of way is interfered with by this flood of experiences and activity and thoughts that aren't under an individual's direct control. They control him rather than him controlling them. And the same holds for malice aforethought, which is a fancy designation that would also fall under this category of—not his—again, a certain context, certain circumstances, his not being able to form those kinds of, um, intentions toward another person, maybe being distracted by thinking of other things and acting in ways that are not quite consistent with what he's thinking in virtue of having so many things on his mind and having so much energy to expend."

The above excerpts show that Dr. Howsepian's opinions in relation to the question of whether or not Cowan actually formed the required mens rea for the charged crimes were, at best, generalized and equivocal. His testimony must be balanced against the considerable amount of evidence presented on the issue of malingering, which was itself reflective of Cowan's ability to plan and deliberate. The properly admitted evidence regarding the hypothetical question posed to Officer Maldonado and Cowan's admissions to Dr. Kendall about fleeing the scene, changing out of the bloody clothes, and hiding from police was highly probative of his thought process and decision-making capacity on the day of the shooting. The manner in which the crimes were committed offered further insight into his mental state. (See *People v. Smith* (2005) 37 Cal.4th 733, 741 [firing shots at a victim from close range permits an inference of intent to kill]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1127 ["an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive."]; *People v. Walker* (1988) 47 Cal.3d 605, 632 ["The execution-style shooting clearly evinces an intent to kill."].) Given the weight of the evidence in support of the verdict and the relative weakness of the defense case, it is unlikely that any reasonable juror would have been swayed by Dr. Howsepian's testimony in the absence of the interrogation evidence.

Equally important to our analysis is the jury's true finding on the robbery special circumstance allegation. Dr. Howsepian offered no testimony in regards to the required mens rea for robbery. The interrogation evidence was arguably favorable to Cowan on this issue because it at least showed that he had previously denied making any attempt to rob his victims. Without that evidence he would have had

virtually no defense to the charges in Counts 2 and 4. By finding the robbery special circumstance allegation to be true, the jury effectively adopted the prosecution's felony murder theory. Felony murder does not require proof of premeditation, deliberation, or the intent to kill. (*People v. Bryant* (2013) 56 Cal.4th 959, 965; *People v. Thornton* (2007) 41 Cal.4th 391, 436.) As such, appellant's first degree murder conviction was all but inevitable. The totality of the evidence thus compels us to conclude it is not reasonably probable that, but for counsel's failure to object to the *Miranda* violation, the outcome of the case would have been different.

Cowan, 2015 WL 4199118, at *5–7.

The California Court of Appeal set forth the correct legal standard for ineffective assistance of counsel claims. As discussed in section IV(A)(2), *supra*, the Court has found that the improper admission of Petitioner's interrogation statements did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Therefore, under the "doubly deferential" AEDPA review of ineffective assistance of counsel claims, Woods v. Donald, 135 S. Ct. 1372, 1376 (2015), the California Court of Appeal's denial was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

### 3. Failure to Request Instructions

In his third claim for relief, Petitioner asserts that trial counsel was ineffective by failing to request instructions on the defense of accident. (ECF No. 1 at 9). Specifically, Petitioner contends that trial counsel should have requested CALCRIM No. 3404. (Id. at 33). Respondent argues that relief should be denied because a fairminded jurist could conclude counsel's decision was both reasonable and nonprejudicial. (ECF No. 9 at 28–29). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

20

In denying this claim, the California Court of Appeal stated:

**Jury Instructions**
Appellant claims that he was prejudiced by the trial court's failure to instruct jurors on involuntary manslaughter as a lesser included offense of murder. He further contends that the jury should have been instructed on all counts pursuant to CALCRIM No. 510 ("Excusable Homicide: Accident") because a finding that the shootings occurred by accident would have negated essential elements of attempted murder, premeditated murder, and felony murder. He faults the trial court for not providing these instructions with respect to Count 1, and claims that his attorney rendered constitutionally deficient performance by failing to request accident instructions in relation to Counts 2, 3, and 4. We are not persuaded by any of these arguments.

*Applicable Law*
Trial courts have a sua sponte duty to instruct on general principles of law relevant to the issues raised by the evidence, which includes giving instructions on lesser included offenses. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085.) The de novo standard of review is applied to questions concerning whether a trial court erred by failing to provide a required instruction. (*People v. Cook* (2006) 39 Cal.4th 566, 596.) Where error is shown, the reviewing court must determine if there is a reasonable probability that the omission affected the jury's verdict. (*People v. Breverman* (1998) 19 Cal.4th 142, 176–177; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson* ).)

Upon request, trial courts are further required to give instructions that pinpoint a defendant's theory of the case if that theory is supported by substantial evidence. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142.) In this context, substantial evidence is "evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) " '[U]nsupported theories should not be presented to the jury.' " (*People v. Marshall* (1997) 15 Cal.4th 1, 40.) The erroneous failure to provide a pinpoint instruction is also evaluated for prejudice under the *Watson* standard. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.)

*Analysis*
"Involuntary manslaughter is 'the unlawful killing of a human being without malice aforethought and without an intent to kill.' [Citation.] A verdict of involuntary manslaughter is warranted where the defendant demonstrates 'that because of his mental illness ... he did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought).' " (*People v. Rogers* (2006) 39 Cal.4th 826, 884.) It follows that an instruction on involuntary manslaughter should be given when there is substantial evidence to support a "diminished actuality" defense. (*Ibid.*; see *People v. Elmore* (2014) 59 Cal.4th 121, 139; § 28, subd. (a) ["Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."].)

The trial court below expressed its view of the evidence as follows: "I simply don't believe there is any reasonable construction of the facts that would support a verdict of involuntary manslaughter." Were we to assume the testimony of Cowan's expert compelled a different conclusion, we would find the error to be harmless pursuant to our analysis in the prior section of the opinion. Furthermore, the jury found that Cowan acted with premeditation and deliberation in his attempt to kill Ms. Leon as alleged in Count 3, thus indicating its rejection of the

diminished actuality defense. It is not reasonably probable that the verdict for Count 1 would have been different had jurors been given the option to find Cowan guilty of involuntary manslaughter rather than first degree murder.

As for the remaining claims of instructional error, the evidence did not warrant any type of advisement on the theory of accidental homicide. It is undisputed that the .22–caliber rifle was a semi-automatic weapon, meaning Cowan had to pull the trigger every time a bullet was fired from the gun. The evidence showed that the deceased victim sustained three bullet wounds, one of which was inflicted at point-blank range while the barrel of the gun was pressed against her head. Moreover, the jury returned true findings on every section 12022.53 allegation, thus confirming its belief that Cowan's use of the firearm was intentional. Hence, if the record could somehow be construed as permitting an instruction on accidental death or accidental use of a firearm, appellant's claims would still fail under the test for harmless error.

Cowan, 2015 WL 4199118, at *7–8.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Strickland, 466 U.S. at 697. Here, Petitioner does not establish "there is a reasonable probability that . . . the result of the proceeding would have been different" if trial counsel had requested CALCRIM No. 3404. Id. at 694.

Petitioner contends that trial counsel should have requested the following instruction based on CALCRIM No. 3404:

> The defendant is not guilty of either robbery or attempted murder if he acted without the intent required for that crime, but instead acted accidentally. You may not find the defendant guilty of either robbery or attempted murder unless you are convinced beyond a reasonable doubt that he acted with the required intent.

(ECF No. 1 at 33). However, even without CALCRIM No. 3404, the jury was instructed with respect to the robbery counts, that it had to find that "[w]hen the defendant used force or fear to take the property, he *intended* to deprive the owner of it permanently . . ." (2 CT 362; 9 RT 2426) (emphasis added). With respect to the firearm enhancements, the jury was instructed that it had to find that "[t]he defendant personally discharged a firearm during the commission of the crime" and that "[t]he defendant *intended* to discharge the firearm." (2 CT 367, 369; 9 RT 2430, 2431) (emphasis added). The jury was instructed with respect to the attempted murder count, that it had to find that "[t]he defendant *intended* to kill that person." (2 CT 364; 9 RT 2428) (emphasis

added). Moreover, with respect to the allegation that the attempted murder was done willfully, and with deliberation and premeditation, the jury was instructed:

> The defendant acted willfully if he intended to kill when he acted. The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant premeditated if he decided to kill before acting.
>
> . . .
>
> The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved.

(2 CT 366; 9 RT 2429). The jury found Petitioner guilty of attempted murder and two counts of robbery. Moreover, the jury found that Petitioner personally and intentionally discharged a firearm during the commission of these crimes, and that the attempted murder was willful, deliberate, and premeditated. (2 CT 411–13). In order to come to these conclusions, the jury must have found that Petitioner acted with the requisite intent as set forth in the instructions. Therefore, even if the jury had been instructed with CALCRIM No. 3404, there is not a reasonable possibility that the result of the proceeding would have been different.

Based on the foregoing, the Court finds that Petitioner is not entitled to habeas relief for ineffective assistance of counsel based on trial counsel's failure to request instructions on the defense of accident. Accordingly, the third claim should be denied.

**C. Cumulative Error**

In his fourth claim for relief, Petitioner asserts that the cumulative errors at his trial require reversal of his convictions. (ECF No. 1 at 11). Respondent argues that the state court's denial of this claim did not violate any right clearly established by the Supreme Court. (ECF No. 9 at 33). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's cumulative error claim, the California Court of Appeal stated:

> In his final argument, Cowan contends that the cumulative effect of the asserted errors deprived him of due process and a fair trial. Under the "cumulative error" doctrine, reversal of the judgment is warranted if it is reasonably probable that the outcome of the case would have been more favorable to him absent a combination of errors. (*People v. Holt* (1984) 37 Cal.3d 436, 458–459.) As previously discussed, any claim of error associated with the admission of evidence in violation of *Miranda* was forfeited and should not be considered in this analysis. However, even taking into account the *Miranda* issues, the facts and circumstances of this case lead us to conclude that the errors alleged by appellant, whether considered individually or collectively, were harmless.

Cowan, 2015 WL 4199118, at *8.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. . . . even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 298, 302–03, 290 n.3 (1973)). The Ninth Circuit has "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) (citing Parle, 505 F.3d at 933). For example, in Parle, "*all* of the improperly excluded evidence . . . supported Parle's defense that he lacked the requisite state of mind for first-degree murder; at the same time, *all* of the erroneously admitted evidence . . . undermined Parle's defense and credibility and bolstered the State's case." Parle, 505 F.3d at 930.

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). Although all the alleged errors concerned whether it was established that Petitioner had the requisite state of mind, there was no "unique symmetry" such that his trial was rendered fundamentally unfair. The state court's denial of Petitioner's cumulative error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

## V.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **June 7, 2017**

UNITED STATES MAGISTRATE JUDGE